## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLENE RENEE CARNEY, | ) | CASE NO. 1:16cv02136 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Charlene Renee Carney ("Plaintiff"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for preparation of a Report and Recommendation.

For the reasons set forth below, it is recommended that the Commissioner's final decision be

VACATED and this matter be REMANDED for further proceedings.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

On November 18, 2013, Plaintiff filed applications for POD, DIB, and SSI, alleging a disability onset date of June 15, 2009.  (Transcript ("Tr.") 212, 218).  The applications were denied initially and upon reconsideration, and Plaintiff  requested a hearing before an administrative law judge ("ALJ").  (Tr. 134, 141, 149, 156, 161).

On June 1, 2015, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 32).  On July 7, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 15).  The ALJ' s decision became final on July 21, 2016, when the Appeals Council declined further review.  (Tr. 1).

On August 25, 2016, Plaintiff filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 15, 17).  Plaintiff asserts the following single assignment of error:

- That the ALJ's evaluation of treating physician Ewa Gross, M.D., violated the treating physician rule.

(Doc. No. 14 at 21-24).

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Plaintiff was born in 1965 and was 44 years-old on the alleged disability onset date, making her a "younger" person under social security regulations.  (Tr. 22, 38).  She has a high school level education and is able to communicate in English.  (Tr. 41).  She has past relevant work as a carpet cleaner, retail stock clerk, machine operator, laborer, and material handler.  (Tr. 63-64).

**B.     Medical Evidence**

On December 26, 2009, Plaintiff presented in the emergency department complaining of swelling in her lower extremities.  (Tr. 553).  She also expressed concern about her kidneys.  (Tr. 553).  She was diagnosed with edema.  (Tr. 556).  On January 4, 2010, she again presented to the emergency department complaining of right flank pain and right upper quadrant pain, with stated history of left renal failure.  (Tr. 569).  Plaintiff reported that she had been seeing a urologist, and, because of her pain and nausea, she was concerned that she had a kidney stone.  (Tr. 569).  Palpation of the cervical, thoracic, or lumbar vertebral bodies did not elicit pain or tenderness.  (Tr. 570).  She was treated with an injection of Toradol and discharged in stable condition with a diagnosis of right flank pain and abdominal pain (non-surgical).  (Tr. 572).

On February 1, 2011, Plaintiff presented to Robert Abouassaly, M.D. for evaluation of recurrent urinary tract infections and flank pain.  (Tr. 407).  Dr. Abouassaly noted that her left kidney was nonfunctioning and may have been contributing to her recurrent urinary tract infections.  (Tr. 408).  Surgery to remove the left kidney was discussed.  (Tr. 408).  He noted that, with respect to her right side, there was no evidence of a UPJ (Ureteropelvic Junction) obstruction by criteria, but that it may have been functionally obstructed or contributing to possible pain.  (Tr. 408).  On March 18, 2011, Plaintiff underwent a left nephrectomy to remove her atrophic kidney (Tr. 653).  She followed up with Dr. Abouassaly on March 29, 2011.  He noted that she had been doing well since then, that she had recovered well, and that her pain was almost resolved.  (Tr. 404).

On May 8, 2011, Plaintiff presented in the emergency department complaining of pain on her right side that felt "like a kidney infection."  (Tr. 381).  She was diagnosed with

hydronephrosis (swelling in her kidney), given medication, and discharged on the same day. (Tr. 381, 385). On May 10, 2011, she followed up with Dr. Abouassaly who noted worsening hydronephrosis. (Tr. 403). He planned to proceed with cysto retrograde and stent placement to relieve an obstruction and to help with her pain. (Tr. 403). She underwent surgery on May 13, 2011, which included a right ureteral stent placement. (Tr. 416). Plaintiff was seen for follow-up on May 26, 2011, and Dr. Abouassaly noted some spasms with the stent, some discomfort in her kidney and bladder, as well as intermittent hematuria, that was worse with activity. (Tr. 402).

On July 15, 2011, Plaintiff presented to the emergency department with pain in her right flank. (Tr. 372). She was diagnosed with a urinary tract infection and given medication. (Tr. 374). A CT scan revealed no kidney stones. (Tr. 374). She followed up with Dr. Abouassaly on July 19, 2011. (Tr. 401). He noted the emergency visit and that she had developed and continued to have pain and an infection in her right side. (Tr. 401). Dr. Abouassaly concluded that her pain may be due to an obstruction and he recommended another surgery. (Tr. 401). Plaintiff underwent surgical procedure on July 22, 2011, which included cystoscopy, right retrograde pyelogram, and right ureteral stent placement. (Tr. 414).

On September 9, 2011, Plaintiff was hospitalized and she underwent additional surgeries, including cystoscopy with right double-J stent exchange and laparoscopic robot-assisted dismembered pyeloplasty on the right, to treat her right ureteropelvic junction ("UPJ") obstruction. (Tr. 411). Plaintiff was discharged on September 12, 2011, with diagnoses of recurrent urinary tract infections, right flank pain, right ureteropelvic junction obstruction, and right hydronephrosis. (Tr. 421).

4

Plaintiff was seen for follow-up on October 4, 2011, and she had been doing well since surgery. (Tr. 399). On October 18, 2011, Plaintiff was seen for stent removal. (Tr. 398). Dr. Abouassaly noted that she had "no issues related to her stent or recovery from her surgery" (Tr. 398). A renal ultrasound on November 15, 2011, revealed dilated renal pelvis and collecting system consistent with UPJ obstruction; at least two nonobstructing right renal calculi; and post left nephrectomy. (Tr. 427). On December 1, 2011, diagnostic imaging revealed normal right renal perfusion and function with no significant sign of anatomical obstruction. (Tr. 426).

On December 6, 2011, Plaintiff was seen by Dr. Abouassaly for follow-up. (Tr. 397). He noted that she had been doing well since surgery and that the stent was removed six weeks prior. (Tr. 397). Her most recent creatinine was "was as good as it has ever been." (Tr. 397). Plaintiff complained of some persistent discomfort in the right upper quadrant, and Dr. Abouassaly concluded that there was no anatomic reason for the pain. (Tr. 397). He recommended she discuss her pain with pain management. (Tr. 397).

On December 12, 2011, Plaintiff sought treatment in the emergency department for left lower back pain. (Tr. 362). She was diagnosed with back muscle strain, given a prescription, and discharged. (Tr. 366).

Plaintiff presented to Dr. Abouassaly on June 7, 2012, at which time she had no significant pain or infections. (Tr. 396). He noted he was pleased with the outcome of her kidney removal surgery. (Tr. 396). He also noted the presence of a kidney stone, but he wanted her surgery to heal before treating it. (Tr. 396). A kidney ultrasound on June 8, 2012, revealed mild hydronephrosis, an improvement compared to November 15, 2011, with dilatation of the proximal right ureter, and two nonobstructing kidney stones. (Tr. 425).

On June 11, 2012, Plaintiff established care with primary care physician Ewa Gross, M.D., complaining of frequent nose bleeds and fatigue for several months. (Tr. 515). She was diagnosed with hypothyroidism, thyroidomegaly; fatigue; frequent loose stools, and chronic kidney disease. (Tr. 515). Dr. Gross ordered an ultrasound of Plaintiff's thyroid which showed a small, diffusely heterogeneous-appearing thyroid gland possibly related to Hashimoto's thyroiditis. (Tr. 996). Plaintiff presented for follow up with Dr. Gross on hypothyroidism and chronic kidney disease on June 25, 2012, and July 27, 2012. (Tr. 513-514).

On October 19, 2012, Plaintiff reported to Dr. Gross that she was feeling pretty good except for frequent headaches. (Tr. 512). She was referred to a Neurologist for her headaches and to an Urologist for her right upper quadrant pain and right flank pain. (Tr. 512). On November 30, 2012, Plaintiff was seen by Dr. Gross on follow-up for hypertension (Tr. 507).

On December 6, 2012, Plaintiff was seen for routine follow-up by Dr. Abouassaly, who noted that Plaintiff was now "pain free," and "doing well," and scheduled treatment for her kidney stones in her remaining kidney. (Tr. 395). A CT scan of the abdomen and pelvis on December 10, 2012, revealed non-obstructing stones in the right kidney, mild renal cortical scarring in the upper pole, and lower pole tiny hypodensity, probable subcentimeter cyst. (Tr. 424). An operative report for January 15, 2013, shows right cystorethroscopy with right retrograde pyelography, diagnostic ureteroscopy right ureteral stent placement (Tr. 409).

In January 8, 2013, Plaintiff followed-up with Dr. Gross, complaining of right lower back pain. (Tr. 503). On physical examination, there was neither joint swelling nor stiffness, and Plaintiff's gait was normal. (Tr. 505). Dr. Gross diagnosed backache and kidney stones. (Tr. 506). She was prescribed Tramadol. (Tr. 506). On March 28, 2013, Plaintiff sought treatment

from Dr. Gross. (Tr. 498). Plaintiff complained of feeling very tired in the previous few weeks. (Tr. 498). Diagnoses included fatigue; hypothyroidism; esophageal reflux; elevated blood pressure; and kidney stones. (Tr. 501). Plaintiff sought treatment for back pain from Dr. Gross again on July 11, 2013. (Tr. 491). Dr. Gross adjusted Plaintiff's medication and advised her to return in three weeks. (Tr. 491). An x-ray of Plaintiff's cervical spine showed degenerative changes that were mild to moderate. (Tr. 518).

On July 29, 2013, Plaintiff presented to neurologist Marek Buczek, M.D., complaining of headache and neck pain. (Tr. 450). Plaintiff reported a ten year history of headaches characterized by a throbbing sensation in the right side of the head and neck and sometimes behind the right eye. (Tr. 450). Plaintiff also reported photophobia, phonophobia, and nausea. (Tr.450). She experienced headaches off and on "at least 3 or 4 times a week." (Tr. 450). Plaintiff also reported some sensory symptoms in both feet. (Tr. 453).

Dr. Buczek performed a a neurological examination which revealed decreased light touch, pinprick and temperature with stocking/glove distribution bilaterally and symmetrically; vibration was diminished in both feet but was normal in the hands; deep tendon reflexes normal with the exception of both ankle jerks, which were difficult to obtain; gait was slightly wide based, but stable; and she could stand on heels and toes, but she had some problems with tandem walk. (Tr. 453). Dr. Buczek noted that Plaintiff's back was supple and there was no focal tenderness in her scalp or skull. (Tr. 453). He also reported a full range of motion in the cervical spine. (Tr. 453).

Dr. Buczek diagnosed a combination of cervicogenic headaches with tension-type headaches; neck pain likely related to cervical spondylosis; peripheral neuropathy possibly

related to her thyroid problems; and chronic but stable low back pain. (Tr. 454). Plaintiff was prescribed Amitriptyline and MehtylPrednisolone. (Tr. 453). Dr. Buczek advised that she would benefit from physical therapy. (Tr. 454).

X-rays of the cervical spine dated July 29, 2013, revealed diffuse disc space narrowing, greater from C4-C7 with spondylitic osteophytes; mild bilateral osseous neural foraminal narrowing at C5-C6 due to osteophytes; and straightening of the cervical lordosis. (Tr. 460, 632, 983).

On September 12, 2013, Plaintiff presented to Dr. Buczek with chronic neck and lower back pain with bilateral pain and numbness in upper and lower extremities, worse on the right side. (Tr. 455). Plaintiff reported having started physical therapy and that she had some improvement with neck pain and headaches. (Tr. 457). Nerve conduction studies on Plaintiff's right arm and leg revealed no denervation in any muscle. (Tr. 455). Other than some reduced recruitment in some of the muscles, her muscle unit morphology, activation, and recruitment patterns were normal. (Tr. 455). An EMG examination of her right arm and leg showed evidence of chronic right C7 and right L4 radiculopathy without active denervation. (Tr. 455). She was referred to pain management for her lumbar radiculopathy, bulging cervical disc low back pain and neck pain. (Tr. 461).

On September 17, 2013, an MRI of Plaintiff's cervical spine revealed disc herniations at C4-C5 through C6-C7 with associated posterior displacement and mild ventral flattening of the cord at C5-6; mild degenerative changes in the cervical spine at C4-C5 through C6-7. (Tr. 443-444). An MRI of the lumbar spine revealed disc herniations at T11-T12, with effacement of the ventral thecal sac, mild bulging disc, and mild facet and ligamentum flavum hypertrophy at

8

L2-L3 and L3-L4; disc herniation superimposed on circumferential disc bulging, also facet and ligamentum flavum hypertrophy, with significant effacement of thecal sac at L4-L5; and degenerative end plate changes at L5-S1, and fairly severe degenerative disc space narrowing with mild left and moderate right foraminal encroachment, and mild hypertrophic spurring; mild degenerative disc space narrowing and spurring at T11-T12 and less extent at L4-L5. (Tr. 445-446).

On September 24, 2013, Plaintiff presented to Al-Amin A. Khalil, M.D., complaining of neck, back, and right arm pain. (Tr. 436). Plaintiff reported that she was currently in physical therapy, which helped "briefly" but the pain returned after her sessions. (Tr. 436). Dr. Khalil noted that her MRI results showed disc herniations. (Tr. 436). Examination revealed mild pain to palpation over the cervical spine, and limited cervical spine range of motion due to pain; 5/5 motor strength; and no sensory deficits. (Tr. 437). Dr. Khalil diagnosed Plaintiff with cervical disc displacement and radiculopathy, and suggested that she undergo a cervical epidural steroid injection and use a TENS[2] unit. (Tr. 437).

On September 30, 2013, Plaintiff presented to Dr. Gross for follow-up. (Tr. 476). The treatment note reveals that Plaintiff's headaches had improved only slightly with steroids and Amitriptyline. (Tr. 476). Diagnoses included benign polyps of the large intestine; nephrolithiasis; urinary tract infection; chronic kidney disease, stage 2; esophageal reflux; and hypothyroidism. (Tr. 483).

---

[2]     "Transcutaneous electrical nerve stimulation (TENS) is a therapy that uses low-voltage electrical current for pain relief." WebMD, Health A-Z, Pain Management, http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulation-tens-topic-overview (last visited June 2, 2017).

On October 2, 2013, Plaintiff sought treatment from nurse practitioner Brian Dyko for headache and neck pain. (Tr. 770). Plaintiff's motor strength was 5/5, her muscle tone was normal, and her gait was stable. (Tr. 771-72). Mr. Dyko diagnosed backache, cervical radiculopathy, lumbar radiculopathy, neck pain, and lower back pain. (Tr. 773). Plaintiff was given medication for pain and advised to return in 2-3 months. (Tr. 773).

On October 3, 2013, Plaintiff was seen for follow-up by Dr. Abouassaly, who noted that a recent MRI of the spine revealed a dilated kidney. (Tr. 763). She remained asymptomatic with no urinary tract infections and no pain. (Tr. 763). Dr. Abouassaly explained that her kidney will always appear dilated just based on the fact that she had a UPJ obstruction in the past. (Tr. 769).

On November 11, 2013, Plaintiff returned to Dr. Gross, complaining of redness and itching in both eyes, tearing, and swelling for a few days. (Tr. 469). She also reported that her headaches had not improved. (Tr. 469).

On January 20, 2014, Plaintiff was seen Brian Dyko, NP for headache and neck pain. (Tr. 747). Plaintiff reported her right shoulder was worse and she thought it was related to her neck pain. (Tr. 747). She had stable neurological exam with findings that confirmed cervical radiculopathy. (Tr.750). Plaintiff was also seen by Dr. Gross on January 20, 2014, complaining of pain in her ribs on her left side that started after she lifted her grandchild. (Tr. 751). She also had a skin rash. (Tr.751). The diagnoses were rib pain on left side, goiter, hypothyroidism, solitary thyroid nodule, and back pain. (Tr. 755).

On February 19, 2014, Plaintiff presented to Dr. Abouassaly, M.D., who noted that she had been doing well since surgery. (Tr. 743). Plaintiff complained of recently developed right flank pain. (Tr. 743). A CT scan showed possible kidney stone. (Tr. 743). Plaintiff followed

up with Dr. Abouassaly on March 6, 2014. (Tr. 739). He recommended that her pain management doctor differentiate the cause of pain, since there was no evidence of stones or ureteral obstruction. (Tr.742).

On March 24, 2014, Plaintiff presented to Dr. Khalil for pain management follow-up complaining of back pain and neck pain. (Tr. 665). On physical examination, her gait, muscle strength, and sensation were normal, and she had a normal range of motion in her back and neck. (Tr. 667). Dr. Khalil noted a known history of cervical and lumbar neuritis with spondylosis. (Tr. 668). It was noted that her neck pain affected her shoulders and her neck/head, worsened by rotation, indicating facet arthroplasty. (Tr. 668). An MRI showed multilevel stenosis of cervical and mild lumbar canal stenosis. (Tr. 668). Dr. Khalil recommended a change in medication and encouraged both physical therapy and a lumbar injection. (Tr. 668). On April 8, 2014, Plaintiff underwent operative procedure of bilateral C3, C4, and C5 medial branch block under fluoroscopic guidance. (Tr. 669).

On April 23, 2014, Plaintiff was seen by Dr. Gross, with a complaint of heartburn and to discuss Amitriptyline. (Tr. 727). Her diagnoses were depression with anxiety, insomnia, hypothyroidism, goiter, Hashimoto's thyroiditis, solitary thyroid nodule, abdominal pain - epigastric, and esophageal reflux. (Tr.732). She was started on Trazodone, and Amitriptyline was discontinued. (Tr.732).

On May 6, 2014, Plaintiff presented to Dr. Khalil, with complaints of back pain and right shoulder pain. (Tr. 716). She reported that her neck pain caused headaches and radiated down the right upper extremity. (Tr. 716). She noted that following the cervical medial branch block without significant benefit. (Tr. 716). It was reported that her pain was exacerbated by turning

11

her head side-to-side or by looking up.  (Tr. 716).  She reported increased low back pain with flexion, and associated with intermittent numbness in the right three toes.  (Tr. 716).  Plaintiff reported using Tramadol about three times per day.  (Tr. 716).  Examination showed decreased sensation to sharp touch in the right upper extremity.  (Tr. 719).  The diagnosis was cervical radiculopathy.  (Tr. 720).  She was started on Gabapentin and advised to schedule a cervical epidural.  (Tr. 720).

On August 27, 2014, Plaintiff was seen by Dr. Gross, for regular check-up and laboratory results.  (Tr. 705).  Plaintiff reported that she had been feeling "pretty good," but recent blood work showed deteriorating kidney function.  (Tr. 705).  She complained of frequent loose bowel movements and frequent heartburn.  (Tr. 705).  She was referred to Nephrology for evaluation of her kidney function.  (Tr. 714).

On February 20, 2015, Plaintiff sought treatment from Zachary Zumbar, M.D., for neck and low back pain.  (Tr. 938).  Plaintiff reported that her pain was 5/10 and she had some tenderness along her spine and swelling in her neck.  (Tr. 938-939).  Her muscle strength was 5/5 throughout, and her muscle tone was normal.  (Tr. 939).  Dr. Zumbar opined that her signs and symptoms were consistent with spondylosis, degenerative disc disease, and facet syndrome of the cervical and lumbar spines.  (Tr. 939).  He prescribed medication and advised Plaintiff to return in 3-4 weeks.  (Tr. 939).

**C.    Opinion Evidence**

In February 2014, Steve E. McKee, M.D., evaluated Plaintiff's records on behalf of the state agency.  (Tr. 81).  Dr. McKee opined that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for six hours in an eight-hour workday,

and sit for six hours in an eight-hour workday. (Tr. 79-80). He further opined that Plaintiff could frequently crawl, kneel, and climb stairs or ramps; occasionally crouch, stoop, and climb ladders, ropes or scaffolds; and occasionally reach overhead. (Tr. 80). Dr. McKee listed Plaintiff's degenerative disc disease of her spine as the reason for the postural limitations he outlined. (Tr. 80).

In April 2014, Elaine M. Lewis, M.D., reviewed Plaintiff's records on behalf of the state agency on reconsideration. (Tr. 111). Dr. Lewis affirmed the opinion from Dr. McKee, except Dr. Lewis opined that Plaintiff could never climb ladders, ropes, or scaffolds. (Tr. 110). Dr. Lewis cited Plaintiff's degenerative disc disease of the spine as the evidence to support her limitations. (Tr. 110).

In February 2015, Plaintiff's treating physician Dr. Gross completed a Medical Source Statement on behalf of Plaintiff. (Tr.. 875-77). Dr. Gross opined that Plaintiff could occasionally lift 20 pounds; stand or walk for a total of 30 minutes and for 15 minutes without interruption; and that sitting was not affected by her impairments. (Tr. 875-76). Dr. Gross noted Plaintiff's back pain and disc herniations as the medical findings that supported her opinion. (Tr. 875). She also opined that Plaintiff could never climb, balance, stoop, or crouch, but could occasionally crawl or kneel. (Tr. 876). Dr. Gross further opined that Plaintiff would be limited in reaching, handling, and fingering due to carpal tunnel syndrome, and would be limited in pushing and pulling. (Tr. 876). Due to Plaintiff's migraine headaches, Dr. Gross opined that she should be limited around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration. (Tr. 876). According to Dr. Gross, Plaintiff would be absent from work due to her impairments more than three times per month. (Tr. 877).

**D.** **Hearing Testimony**

During the June 1, 2015, hearing, Plaintiff testified to the following:

• Plaintiff stated that she had not worked full-time since 2008, when she had a job cleaning carpets. She stated that it was too much for her to handle. (Tr. 42).

• Plaintiff testified that she stopped working because she was getting sick as result of problems with her kidney function and problems with her neck and back. (Tr. 46). At first, she did not know the issues were kidney related. (Tr. 46). In 2004, she was admitted to the hospital, because "my system was shutting down" as a result of her kidney problems. (Tr.46). In 2010, she had a kidney removed. (Tr. 46).

• She testified that she has sought treatment several times due to problems with her remaining kidney, which causes her a lot of pain in her side. (Tr. 47-48). She also has problems with a loose bladder, with some history of urinary accidents (Tr.48). She does not use diapers, but she does use a pad which does not always prevent her from soaking through to her clothes. (Tr.49). She estimated that this happened a couple of times a week. (Tr.49).

•

• Plaintiff testified that she attends mental health counseling weekly since about 2009. (Tr. 50). She explained she was prescribed Sumatriptan for severe migraine headaches. (Tr. 51). She also takes Cymbalta for depression. (Tr. 52).

• Plaintiff noted she was experiencing swelling in her hands for the previous couple months. (Tr. 56). She said it causes her hands to cramp and it affects her strength and squeezing ability, but the problem comes and goes. (Tr. 56). She testified that she has her 13 year old grandson help her a lot. (Tr. 56).

• She also noted that walking causes her feet and legs to swell. (Tr. 56-57). Sometimes she wakes up in the morning with swelling and a headache. (Tr. 57). She tries to decrease the problems with swelling by lying down and putting her legs up on pillows to elevate them above her heart level daily for the past couple of months. (Tr. 57). She has had problems with swelling off and on since her kidney problems started, and she had been elevating her feet for at least a couple of hours a day at least two to three times a week. (Tr. 58).

• Plaintiff also testified that in addition to neck pain, she has pain in the middle and lower part of her back. (Tr. 58). She uses a TENS unit which does not help a lot, but it does relieve her pain a little bit. (Tr. 58). Her back pain affects her ability to sit for any length of time, and after sitting close to an hour, she has trouble standing up to move. (Tr. 59). She has to stand up and stay still for about five minutes before she can start walking. (Tr. 59). She did not think she could work

14

on a task while seated, and then stand to continue working, because she has to move, stretch out, or do something for about 15 to 20 minutes before being able to return to sitting down. (Tr. 60). She is very restricted as far as what she can take for her pain and problems because things like Aleve, Ibuprofen, and anti-inflammatories are bad for her kidney. (Tr.60).

The VE testified that Plaintiff had past work as a a carpet cleaner, retail stock clerk, machine operator, laborer, and material handler. (Tr. 63-64). The ALJ then posed the following hypothetical question:

Please assume an individual with the claimant's age, education, experience. Has the residual functional capacity for light work and can occasionally climb ramps or stairs. Never climb ladders, ropes, or scaffolds. Occasionally stoop, crouch, kneel, balance, and crawl. Occasionally reach overhead and in front with right upper extremity. Never work around unprotected heights or moving machinery and never work around extreme heat or cold and occasionally operate foot controls. Would such an individual be able to perform the claimant 's past work?

(Tr. 64-65). The VE testified the hypothetical individual would not be able to perform her past work. (Tr. 65). However, the VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as inspector and packager. (Tr. 65-66).

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while he/she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

# IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since June 15, 2009, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.  The claimant has the following severe impairments: herniated discs at T11-T12 and L4-L5; chronic kidney disease requiring the removal of one kidney; and inflammatory bowel disease ("IBD") (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant: can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally stoop, crouch, kneel, balance, or crawl; can occasionally reach overhead and in front with the right upper extremity; can never work around unprotected heights or moving machinery; can never work around extreme heat or cold; and can occasionally operate foot controls.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on June 5, 1965 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-24).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could

reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS: The Treating Physician Rule

Plaintiff maintains that the ALJ erred by failing to provide good reasons for affording Dr. Gross' opinion less than controlling weight. The Court agrees for the reasons described below.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408; *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, id., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, id. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p); *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

In the present case, Plaintiff's treating physician Dr. Gross opined *inter alia* that Plaintiff is able to lift/carry 20 pounds; that she is able to stand or walk no more than 30 minutes in an 8-hour day; that she is able to stand or walk for no more than 15 minutes without interruption; that she had postural limitations; that she was limited in her ability to reach, handle, and finger; and that she would be absent from work more than three times a month due to her impairments. In support of her assessment, Dr. Gross noted the existence of several disc herniations in the lumbar, cervical, and thoracic spines. Dr. Gross also noted a carpal tunnel diagnosis and Plaintiff's subjective reports of pain.

The ALJ reviewed Dr. Gross' opinion and evaluated it as follows:

Even though Dr. Gross is a treating physician, I am not given [sic] the opinion controlling weight. I have given Dr. Gross' opinion little weight as it is inconsistent with the medical record as a whole. There is nothing in the record to suggest that the claimant can only stand or walk for a total of 30 minutes in an eight-hour day, or that she would be absent more than three times a month. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

The ALJ essentially provided three reasons why Dr. Gross's opinion deserves less than controlling weight, but none of them, either singly or in combination, amounts to a "good reason." First, the ALJ asserted, without elaboration or citation to the record, that Dr. Gross's opinion is inconsistent with the record as a whole. The Sixth Circuit has made clear that an ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for rejecting these opinions. *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245–46 (6th Cir. 2007) (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations).

22

Here, the Commissioner argues that the ALJ's recitation of the medical evidence in an earlier section of the administrative opinion adequately supports his decision to afford Dr. Gross' opinion less than controlling weight. As mentioned by the Commissioner, the medical evidence section of the ALJ opinion included treatment notes showing that Plaintiff was "doing well" on two instances in 2014. Another cited treatment note mentioned by the ALJ indicated that the TENS unit had been "quite helpful" to Plaintiff.

First, these three isolated pieces of evidence hardly demonstrate that Dr. Gross' opinion is inconsistent with the medical record *as a whole*. Furthermore, although the ALJ recited some of the pertinent record evidence, he failed to offer any specific discrepancies and explain how that evidence is inconsistent with Dr. Gross' opinion. *See Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013) (an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected."). In addition, while the Commissioner contends that the ALJ rejected Dr. Gross' opinion because Plaintiff's condition was improving, the ALJ did not actually articulate this as a reason for affording the opinion less than controlling weight. It is well-settled that the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration." *Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

Therefore, the ALJ's failure to meaningfully substantiate his conclusion that Dr. Gross' opinion was inconsistent with the record as a whole is error.

The Court also rejects the ALJ's second reason for discounting Dr. Gross' opinion, i.e., that "there is nothing in the record to suggest that the claimant can only stand or walk for a total of 30 minutes in an eight-hour day, or that she would be absent more that three times a month." This assertion is incorrect as it ignores record evidence showing that Plaintiff suffered multiple disc herniations up and down her spine, which was noted in Dr. Gross' opinion. An MRI from September 13, 2013 reveals disc herniations at C4-C5 through C6-C7 with associated posterior displacement and mild ventral flattening of the cord at C5-C6; mild degenerative changes in the cervical spine at C4-C5 through C6-C7. (Tr. 444). An MRI of the lumbar spine showed disc herniations at T11-T12, with effacement of the ventral thecal sac; mild bulging disc and mild facet and ligamentum flavum hypertrophy at L2-L3 and L3-L4; disc herniation superimposed on circumferential disc bulging, also facet and ligamentum flavum hypertrophy, with significant effacement of thecal sac at L4-L5; and degenerative end plate changes at L5-S1, and fairly severe degenerative disc space narrowing with mild left and moderate right foraminal encroachment, and mild hypertrophic spurring; mild degenerative disc space narrowing and spurring at T11-T12 and less extent at L4-L5 (Tr.445-446). This is evidence that could support the limitations to which Dr. Gross opined.

Also contrary to the ALJ's conclusion that "nothing in the record" supports the limitations to which Dr. Gross opined are treatment notes showing pain to palpation over the cervical spine, and limited cervical spine range of motion secondary to pain. (Tr. 437). In addition, Plaintiff had one of her kidneys removed and she was treated for kidney stones on

several occasions. (Tr. 395, 400, 401, 403, 404, 408, 409, 418, 492, 503). Plaintiff was also being treated for chronic headaches and chronic neck pain. (Tr. 436, 512, 450, 485, 665, 716). Based on the existence of the above cited evidence along with other evidence contained in the record, the Court rejects the Commissioner's contention that the ALJ correctly determined that "nothing in the record" supports the opinion of Dr. Gross.

Finally, the ALJ's third reason for discounting the opinion of Dr. Gross was that "[t]he possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another." The ALJ further opined that "patients can be quite insistent and demanding in seeking supportive notes or reports from their physician, who might provide such a note in order to satisfy their patients [sic] requests and avoid unnecessary doctor/patient tension." Court rejects the ALJ's third reason, as it is entirely speculative. While, as the Commissioner notes, it is *possible* that Dr. Gross formed her opinion in order to appease a patient for whom she had sympathy, this Court's review is not guided by what is possible. Rather, the question here is whether the ALJ decision is supported by *substantial evidence*, and the Court limits its review to the evidence that is *contained in the record. See Miller v.Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016). Here, the Commissioner is unable to direct the Court's attention to any evidence that would reasonably support the ALJ's third reason for discounting the opinion of Dr. Gross. The Commissioner's argument is accordingly rejected.

In sum, the ALJ failed to provide sufficiently specific reasons, supported by record evidence, for affording Dr. Gross' opinion less than controlling weight.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this matter be REMANDED for further proceedings.


<u>  s/Jonathan D. Greenberg</u>
Jonathan D. Greenberg
United States Magistrate Judge

Date: <u>June 9, 2017</u>

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**